* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and oral argument before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 * * * * * * * * * * * RULING ON MOTION TO DISMISS APPEAL
In their brief, defendants stated that they had not received a Form 44 from plaintiff and that plaintiff had therefore abandoned his appeal. Plaintiff did file a complete Form 44, although it was not filed within the 25 days of receipt of the transcript required by Industrial Commission Rule 701. Plaintiff's counsel moved the Commission for authority to file plaintiff's Form 44 and brief in an untimely manner. He stated that the filings were late because of his illness and the illness and unavailability of members of his support staff. Pursuant to Workers' Comp. Rule 801, for good cause shown, the late-filed Form 44 and brief are hereby received by the Commission as if timely filed. Defendants are not prejudiced thereby since their brief spoke to all issues raised by plaintiff's Form 44 and brief. Roberts v. Wal-Mart,
___ N.C. App. ___, 619 S.E.2d 907 (2005), is distinguishable. No Form 44 was filed in Roberts. A full and complete Form 44, albeit late filed, was filed in the instant matter.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant-carrier Hartford Insurance Company was the carrier on the risk.
3. An employee-employer relationship existed between plaintiff and defendant-employer Ecofibers at all relevant times.
4. Plaintiff sustained an admittedly compensable injury by accident on March 8, 2002. Defendants filed an I.C. Form 63 on or after March 28, 2002, pursuant to which they paid plaintiff temporary total disability benefits beginning March 9, 2002.
5. Plaintiff's average weekly wage was $280.00, which yields a weekly compensation rate of $186.67.
6. Plaintiff has been out of work since March 9, 2002.
7. The issues for determination are:
 a. Does plaintiff remain temporarily totally disabled as a result of the March 8, 2002, injury by accident?
 b. Did plaintiff unjustifiably refuse employment procured for him which was suitable to his capacity?
8. The parties stipulated 141 pages of medical records and I.C. forms and filings into evidence.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and the reasonable inferences arising therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff had been hired as a production line worker. He began working for defendant-employer three days prior to the date of the injury giving rise to this claim. His duties were to include lifting bags or rolls which weighed thirty to forty pounds. However, as the employer's production line was not operating, plaintiff was initially assigned to perform odd jobs at the job site for the benefit of the employer.
2. On March 8, 2002, plaintiff sustained an open displaced fracture of the left tibia and fibula, when he was injured by a tree he was cutting for the employer. The Full Commission finds the following testimony of plaintiff to be credible and therefore finds as facts the matters set forth therein.
Q. All right. Now go ahead and tell what happened.
 A. I cut a tree in two on a steep embankment, it didn't fall, and I was looking around for what vines — or what was keeping the tree from falling, and the tree snapped in two — or it came back and pinned me to the bank, breaking my leg.
Q. Did the tree fall on you?
A. It kicked back and then —
Q. Kicked back on you?
A. Yes, sir.
Q. Did you receive any injuries as a result?
 A. Yes. I was pinned into a red clay — a red bank, knocking the bone out of my leg.
Q. Which leg?
A. Left leg.
Q. Okay. And you had a broken bone or broken bones?
 A. Broken bones — but two breaks — two compound fractures and a broke ankle.
3. Following the compensable accident that occurred during the course and scope of plaintiff's employment, plaintiff was taken to Hugh Chatham Memorial Hospital, where orthopedist Marvin Vice, M.D., of Tri-County Orthopedic Sports Medicine, performed an irrigation and debridement of the wounds. Three days later, Dr. Vice performed an open reduction internal fixation of the left tibia with an intramedullary rod. Plaintiff was discharged from the hospital on March 13, 2002.
4. Dr. Vice performed a third procedure on plaintiff on July 12, 2002, in an effort to resolve the delayed union of healing of the tibial fracture by removing the distal screws in the left tibial nail in order to allowing for the impaction of the tibial fracture. By July 27, 2002, Dr. Vice had recognized that the dynamizing of the fracture site through removal of the distal screws had failed to result in any impaction of plaintiff's tibial fracture.
5. Defendant-carrier sent plaintiff to William M. Guideman, M.D., of the Hickory Orthopaedic Clinic, for a second orthopedic opinion on August 15, 2002. At that time, plaintiff had pain in his left leg which was present regardless of weightbearing or non-weightbearing activities. Plaintiff also had vascular problems which caused his legs to swell and turn color distally, and numbness around the distal medial tibial locking screw incisions. With weightbearing, plaintiff was experiencing severe pain in the mid shaft of his tibia overlying the soft tissue defect. When at rest the pain was a 2/10, and when weightbearing the pain was as high as an 8/10. Plaintiff's pain was such that he required ongoing narcotic relief.
6. Following his review of plaintiff on August 15, 2002, Dr. Guideman concluded, and the Full Commission finds as fact, that plaintiff had a definite nonunion of the fracture site. The dynamization with removal of the distal locking screws on July 12, 2002, had been unsuccessful, given plaintiff's inability to bear weight and the fact that his fibula had healed in such a manner as to prevent the impaction of the tibia fracture sufficient to incite healing, despite the removal of the dynamization screws. Moreover, the fracture brace being worn by plaintiff was not providing plaintiff any sort of comfort or stability, and essentially was not providing him any benefit at all. Nonetheless, given the healing of plaintiff's fibula, there was no worry about potential loss of rotation or alignment of the tibia. Dr. Guideman's recommended course of action was to remove the intramedullary nail, which would be a difficult proposition as it was placed in an unusual starting position and is counter-sunk within the bone proximally, making it difficult to retrieve the nail and to remove it given its current position. Once the nail was removed, plaintiff's tibial shaft would be reamed to incite revascularization of the tibial fracture site, and plaintiff's fibula would be osteotomized to allow the tibial fracture to impact sufficiently to heal. Given plaintiff's open wounds, Dr. Guideman recommended against proceeding with any bone grafting at that time, but consideration to bone grafting could be given at a later date if plaintiff's nonunion did not heal.
7. Plaintiff testified, and the Full Commission finds as fact, that defendant-carrier rejected Dr. Guideman's surgical recommendations, and instead sent plaintiff to James Sebold, M.D., of Charlotte Orthopedic Specialists, on September 11, 2002, for a different second orthopedic opinion. Dr. Sebold reservedly concurred with the recommendation of Dr. Vice of August 30, 2002, that a bone growth stimulator might help to resolve the delayed union of the left tibia in lieu of surgery. However, even Dr. Sebold concluded that, "[i]f [plaintiff] does not heal over the next couple of months, I would consider a revision surgery with a reamed nail and possible bone grafting," in accordance with Dr. Guideman's recommendations.
8. Plaintiff began use of a bone growth stimulator under the supervision of Dr. Vice and, after Dr. Vice left Tri-County Orthopedic Sports Medicine and moved to Florida in or around February 2003, under the supervision of Frank Cuce, M.D., also of Tri-County Orthopedic Sports Medicine. Despite plaintiff's continued use of the bone growth stimulator over the subsequent months, plaintiff's tibial fracture failed to unionize.
9. On January 8, 2003, because the continued non-union of plaintiff's fracture limited the amount of time plaintiff could spend on his feet, Dr. Vice authorized plaintiff to return to work at one-half day at his regular job, or at a light duty job where he could sit. On February 11, 2003, Dr. Vice wrote to the medical case manager for defendant-carrier that plaintiff would be able to return to some type of light duty at that time, as long as he would not be required to walk on a prolonged basis or stand or climb on a persistent basis. Plaintiff's return to his regular job was delayed, however, until his follow-up visit in six weeks.
10. After Dr. Vice left Tri-County Orthopedic Sports Medicine, Dr. Cuce became plaintiff's authorized treating physician. Dr. Cuce released plaintiff to return to modified duty on March 11, 2003, despite the continued non-union of plaintiff's tibia fracture and plaintiff's reports of on-going pain and discomfort. On April 22, 2003, Dr. Cuce concluded that plaintiff had reached maximum medical improvement, even though plaintiff's fracture had never unionized. Dr. Cuce informed plaintiff that further use of the bone growth stimulator would not unionize the fracture, and that unionization could now be brought about only through surgery and a bone graft, which Dr. Cuce deemed unnecessary. Accordingly, and despite plaintiff's continued reports of pain and discomfort, Dr. Cuce released plaintiff back to full duty status.
11. However, in recognition that plaintiff had not regained full pre-injury functionality of his ankle, Dr. Cuce ordered a functional capacity evaluation (FCE) of plaintiff, to take place on May 13, 2003.
12. On April 29, 2003, defendant-employer sent to plaintiff by certified mail a letter stating that defendant-employer had been notified that plaintiff had been released to full duty work as of April 22, 2003, and directing plaintiff to contact defendant-employer's plant manager by May 5, 2003.
13. Plaintiff contacted defendant-employer through his wife immediately after receiving the letter, and informed defendant-employer that he did not believe that he was capable of full-duty work and that he would not know the full extent of his work limitations until the completion of his FCE on May 13, 2003. Nonetheless, within a week, and before the date of the FCE, plaintiff received a letter from defendant-employer stating that defendant-employer no longer required his services and had no job available for him.
14. On April 27, 2004, plaintiff returned to Dr. Cuce with continuing pain and a burning sensation in his left leg and radiating up into his back and right hip, leading to loss of sleep and significant weight loss. Dr. Cuce found no material change in plaintiff's x-rays regarding the healing of plaintiff's fracture. Dr. Cuce recommended that plaintiff see a pain specialist and possibly a trauma specialist. However, when plaintiff attempted to see the pain specialist recommended by Dr. Cuce, defendant-carrier refused to authorize the appointment.
15. The results of plaintiff's FCE show that, as of May 13, 2003, plaintiff was capable of working full-time at a light-medium level of work, with limited tolerance for squatting, crouching, prolonged walking, stair climbing, and standing.
16. The physical demands analysis of the position that was offered to plaintiff by defendant-employer was assessed by defendant-employer to be a medium level of work. Although Dr. Cuce testified that he believed that plaintiff was capable of performing the work offered by defendant-employer as of April 22, 2003, Dr. Cuce further testified, and the Full Commission finds as fact, that Dr. Cuce was assessing only the physical functionality of plaintiff's ankle; that Dr. Cuce was not an expert in pain or pain management; and that a patient's sensations of pain, independent from his strictly physical capabilities, could have a material impact on the patient's ability to perform a particular job. In Dr. Cuce's words, "If he's in a lot of pain doing what his job demands, then that's going to be a problem for him to get back to work."
17. The Full Commission finds, based on the evidence before it, that plaintiff was not physically capable of performing the job offered to plaintiff by defendant-employer on or about April 29, 2003. Plaintiff testified, and the Full Commission finds as fact, that plaintiff was not able to perform the job offered by defendant-employer at the time that he was released to full duty by Dr. Cuce. Because Dr. Cuce did not and could not assess plaintiff's capability to work given the pain plaintiff was experiencing in his leg and ankle, the Full Commission finds little relevance in Dr. Cuce's assessment of plaintiff's purely physical work capabilities.
18. The Full Commission further finds, based on the continued non-union of plaintiff's tibial fracture and plaintiff's on-going and significant pain, that plaintiff had not reached maximum medical improvement as of the time of the hearing before the Deputy Commissioner. The Full Commission discounts the opinion of Dr. Cuce regarding the lack of necessity of further surgery, in light of the apparently disregarded opinions of Dr. Guideman and Dr. Sebold that surgery to unionize the tibial fracture would be required.
19. On October 6, 2003, defendants submitted an I.C. Form 24 Application to Suspend or Terminate Benefits, stating that Dr. Cuce had released plaintiff to full medium duty work as of April 22, 2003, and that defendant-employer had offered plaintiff a job which plaintiff refused to accept. Plaintiff's response to the Form 24 stated that plaintiff was not able to work and that his old job was not suitable employment.
20. By Order filed on November 6, 2003, Special Deputy Commissioner Elizabeth Maddox disapproved the Form 24 application.
21. Defendants filed an I.C. Form 33 Request for Hearing on November 21, 2003, to appeal the Form 24 disapproval.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reaches the following further:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident on March 8, 2002. N.C. Gen. Stat. § 97-2(6).
2. As a result of his compensable injury, plaintiff suffered compound fractures of his left leg and fractures of his ankle, rendering him temporarily totally disabled. Accordingly, Plaintiff is entitled to temporary total disability compensation at the rate of $186.67 per week from March 8, 2002, and continuing until he is able to return to work at his same or greater wages. N.C. Gen. Stat. § 97-29.
3. Plaintiff's surgeries have not resulted in the union of his broken bones, and plaintiff remains in pain, especially when attempting to bear weight. Both Dr. Guideman and Dr. Sebold, each selected by defendant-carrier to provide secondary opinions, recommended that plaintiff undergo additional surgery to correct the non-union of his tibial fracture. Accordingly, the Full Commission concludes that plaintiff has not reached maximum medical improvement. Crawley v. Southern Devices, Inc.,31 N.C. App. 284, 288-89, 229 S.E.2d 325, 328-29 (1976), disc. rev.denied, 292 N.C. 467, 234 S.E.2d 2 (1977).
4. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure, or lessen the period of disability, including but not limited to surgery and the medical management of pain. N.C. Gen. Stat. § 97-2(19). Plaintiff is entitled to continuing medical care for the injuries and pain he suffered as a result of his compensable accident. Should he desire it, he is entitled to be treated at a pain clinic of his choosing, and if recommended by an orthopedic surgeon of his choosing, he is entitled to surgery to correct the nonunion of his leg bones. N.C. Gen. Stat. §97-25.
5. Plaintiff's failure to accept the position offered to him by defendant-employer on or about April 29, 2003, and withdrawn by defendant-employer before May 13, 2003, was not an unjustified refusal to accept suitable employment, as plaintiff was justified in waiting until at least the May 13, 2003, performance of the FCE ordered for him by his authorized treating physician before deciding whether to accept or reject the offer from defendant-employer. N.C. Gen. Stat. § 97-32.
6. Furthermore, the position offered to plaintiff by defendant-employer was not suitable for plaintiff, given plaintiff's physical limitations at the time the position was offered. Plaintiff's own testimony as to his pain and inability to work is competent evidence as to his actual ability to work.Boles v. U.S. Air, Inc., 148 N.C. App. 493, 499,560 S.E.2d 809, 813.
7. Defendants' attempt to cause plaintiff's compensation to be cut off at a time that they knew his surgeries had been unsuccessful and his bones were at non-union, and despite the referral of plaintiff by his authorized treating physician to a pain specialist, which referral they refused to honor, and their unjustified filing of a Form 24 and a subsequent Form 33, constituted unfounded litigiousness. Because the Full Commission has determined that the Form 24 and Form 33 hearings herein have been brought and prosecuted without reasonable grounds, the Commission may assess the whole cost of the proceedings, including reasonable fees for plaintiff's attorney, upon the party that brought them. N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation at the rate of $186.67 per week from March 8, 2002, until plaintiff is able to return to work at the same or greater wages.
2. Defendants shall pay medical expenses incurred or to be incurred in accordance with the Act when bills for the same have been submitted.
3. Defendants shall pay directly to plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five percent of the compensation awarded to plaintiff in paragraph 1 above as part of the costs assessed pursuant to N.C. Gen. Stat. § 97-88.1. These attorney's fees shall not be deducted from, but shall be paid in addition to, the compensation awarded to plaintiff in Paragraph 1 above. The attorney's fees shall begin with the date of defendants' filing of the Form 24, October 6, 2003. Once the arrearage has been brought up to date, defendants shall send a check to plaintiff's attorney at the same time they send every fourth check to plaintiff, in the same amount as plaintiff's check.
3. Defendants shall pay all costs.
This 10th day of February 2006.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/____________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING IN PART AND DISSENTING IN PART:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER